IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Jose Alfonso Becerra (#85762), ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 16 C 1408 |
| v. ) | |
| ) | Judge Amy J. St. Eve |
| Donald Kramer, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Jose Alfonso Becerra ("Plaintiff"), a pretrial detainee held at the Kane County Adult Justice Center ("KCAJC"), brought this 42 U.S.C. § 1983 suit against Kane County Sheriff Donald Kramer and KCAJC Director James Lewis. Plaintiff alleges that he is shortchanged on meals, that food handling techniques at the jail are unsanitary, and that he suffered food poisoning on December 27, 2015. Now before the Court is Defendants' motion for summary judgment, in which they contend that Plaintiff has not brought forth evidence that Defendants were deliberately indifferent to a serious risk of harm to Plaintiff's health. For the reasons stated herein, the Court grants Defendants' motion.

**BACKGROUND**

**I.      Northern District of Illinois Local Rule 56.1**

The Court received Plaintiff's response to Defendants' motion for summary judgment on October 20, 2016. (Dkt. No. 37.) The response, however, did not comport with the requirements for a proper response under Local Rule 56.1. Because Defendants had not served Plaintiff with a Local Rule 56.2 Notice to Pro Se Litigants Opposing

Summary Judgment, the Court gave Plaintiff another opportunity to respond following service of the notice. (Dkt. Nos. 38, 39.) Plaintiff, however, has not submitted a revised response.

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Generally, the purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (holding that *pro se* plaintiff's statement of material facts did not comply with Rule 56.1 as it "failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture."). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco*, 559 F.3d at 632; *see also Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 513 (7th Cir. 2013).

A district court may insist on strict compliance with its local rules regarding summary judgment. *Metropolitan Life Ins. v. Johnson,* 297 F.3d 558, 562 (7th Cir. 2002). Although Plaintiff is *pro se*, he nonetheless must comply with Local Rule 56.1. *See Cady*, 467 F.3d at 1061 ("even *pro se* litigants must follow rules of civil procedure"). Therefore, the facts set forth in Defendants Local Rule 56.1(a)(3) Statement are deemed admitted to the extent supported by evidence in the record. *See Keeton v. Morningstar, Inc.*, 667 F.3d 880, 884 (7th Cir. 2012). Because Plaintiff is proceeding *pro se*, however, the Court has considered the factual assertions he makes in his response to Defendants' summary judgment motion, but only to the extent he has pointed to evidence in the record or could properly testify himself about the matters asserted. *See Boykin v. Dart*, No. 12 C 4447, 2014 WL 5611466, at *6 (N.D. Ill. Nov. 4, 2014) (Chang, J.) ("Although the Court is entitled to demand strict compliance with Local Rule 56.1, it ordinarily affords *pro se* plaintiffs significant leeway in responding to summary judgment filings.").

## II.     Factual Background

This lawsuit arises from Plaintiff's allegations that he became ill on December 27, 2015, after eating a meal of savory stroganoff that was served to him while detained at the KCAJC. (Defs.' Stmt. (Dkt. No. 34) at ¶ 1.) Plaintiff contends that jail workers failed to: (1) use a steamer to warm food; (2) properly wash food trays and utensils; (3) provide fruit on a daily basis, and (4) provide the correct amount of food with certain meals. (*Id.* at ¶ 2.)

Plaintiff has suffered from gastritis since about 2013 or 2014. (*Id.* at ¶ 9.) Gastritis is a gastrointestinal condition that causes nausea, abdominal pain, and vomiting. (*Id.* at ¶ 10; *see* Mayo Clinic, Gastritis Symptoms, http://www.mayoclinic.org/diseases-

3

conditions/gastritis/basics/symptoms/con-20021032 (last visited January 5, 2017)). Plaintiff's gastritis became so severe that he was vomiting blood for two to three months before getting medication. (*Id.* at ¶ 11; *see* Pl.'s Dep. (Dkt. No. 34-1) at 20:2-20:12.) Plaintiff took prescription medication that alleviated his symptoms. (*Id.* at ¶ 12.) Plaintiff, however, continues to suffer from symptoms of gastritis on and off, and as recently as June 2016. (*Id.* at ¶¶ 13-14.)

Plaintiff alleges that on December 27, 2015, a dinner of rice and meat, identified based on a review of the menu as savory stroganoff, caused him to suffer vomiting and diarrhea. (*Id.* at ¶ 15; *see* Pl.'s Dep. at 38:18-41:1.) Plaintiff submitted a grievance stating that he was sickened with stomach "eachs [sic] and cramps" after eating the meal. (*Id.* at ¶ 16; *see* Grievance Report, Dkt. No. 34-2.) Plaintiff's grievance also stated that the jail had not kept the food in a steamer, that the jail had not changed the menu 15 months, and that commissary prices were too high. (*Id.* at ¶ 17; *see* Grievance Report.)

In response to the grievance, Lt. Corey Hunger investigated and found that no other inmates had complained of food poisoning as a result of the meal. (*Id.* at ¶ 18; *see* Grievance Report.). Lt. Hunger further stated that the jail prepares the meals according to Illinois County Jail Standards. (*Id.*) Director Lewis also investigated Plaintiff's grievance and responded that the food served meets or exceeds county jail standards. (*Id.* at ¶ 19; *see* Grievance Response/Update, Dkt. No. 34-3.)

Plaintiff did not seek medical treatment with regard to the alleged food poisoning, and was not diagnosed with food poisoning by any medical professional. (*Id.* at ¶ 20.) He did not tell any guards that he was sick. (*Id.*) Plaintiff discussed the alleged food poisoning with his cellmate, Moses Ramirez. (*Id.* at ¶ 21.) In addition, Plaintiff did not retain any of

the food or have it tested after getting sick. (*Id.* at ¶ 22.) Plaintiff testified he presumes that he became ill due to the food not being hot, but he also described the food on that day as hot, or at least warm. (*Id.* at ¶ 23; *see* Pl.'s Dep. at 66:7-66:18.)

Lt. Hunger stated that the jail served approximately 400 detainees the same savory stroganoff meal on December 27, 2015. (*Id.* at ¶ 24; *see* Affidavit of Lt. Corey Hunger, Dkt. No. 34-4.) According to Lt. Hunger, Plaintiff is the only detainee who claimed to have gotten food poisoning as a result of the meal. (*Id.* at ¶ 25; *see* Affidavit of Lt. Corey Hunger, Dkt. No. 34-4.) Plaintiff contends that his cellmate, Ramirez, also became ill as a result of the meal, and suffered diarrhea and stomach pains. (Pl.'s Dep. at 51:22-52:14.) Even by Plaintiff's own account, however, it is not clear that Ramirez suffered food poisoning, as opposed to a reaction to soy. Indeed, according to Plaintiff, Ramirez sought medical attention and received a no-soy tray from the jail doctor. (*Id.* at 53:24-55:4.) Plaintiff did not know of anyone else becoming ill as a result of the meal. (*Id.* at 52:15-20.) In addition, the December 27, 2015, incident was the only time Plaintiff alleges to have suffered from food poisoning while detained at the KCAJC. (Defs.' Stmt. at ¶ 26.)

Plaintiff further alleges that the jail shortchanges him on the amount of food served. (*Id.* at ¶ 27; *see* Pl.'s Resp. (Dkt. No. 37) at ¶ 2.) At his deposition, Plaintiff testified that the amount of food on the trays varies. (*Id.* at ¶ 29.) Specifically, he testified that there is random variation in terms of the amount of food. (Pl.'s Dep. at 63:1-6.) "You could get lucky and get more. You could get unlucky and get less." (Pl.'s Dep. at 59:7-14.) Notably, Plaintiff does not contend that he receives an inadequate amount of food as a general matter. (Defs.' Stmt. at ¶ 29; *see* Pl.'s Dep. at 62:23-63:2 ("Do you feel you do not get

5

enough food generally? It's not that. It's just some people get more. So many people get less."))

At the time of Plaintiff's complaint, Jaclyn Lang was the certified dietitian responsible for the inmate menu at the KCAJC. (*Id.* at ¶ 30; *see* Aff. of Jaclyn Lang, Dkt. No. 34-5, at ¶ 2.) Aramak Corporation, which was under contract to provide meals to the inmates at the KCAJC, employed Lang. (Lang Aff. at ¶ 3.) A certified dietician periodically sets the menu for all meals served at the jail to ensure that meals are nutritionally balanced and meet caloric requirements for good health. (Defs.' Stmt. at ¶ 30.) All menus served at the jail, including the menu served to Plaintiff during the relevant time period, meet the guidelines set by the American Correctional Association and are in compliance with the current Dietary Reference intakes for males and females aged 19 to 50 as established by the Food and Nutrition Board of the National Academy of Sciences, Institute of Medicine. (*Id.* at ¶ 31.) All menus served at the jail, including the regular diet Plaintiff was served, include adequate levels of protein, vitamin A, vitamin C, and calcium. (*Id.* at ¶ 32.) The meals served to inmates at the jail average approximately 2,800 calories per day, which exceeds the current daily recommended intake for males and females aged 19 to 50 as established by the Food and Nutrition Board of the Institute of Medicine. (*Id.* at ¶ 33.)

The menu provides for inmates to have either fruit or juice that contains Vitamin C. (*Id.* at ¶ 37.) The juice served is 100 percent juice from concentrate and meets the requirements set by the Food and Nutrition Board of the Institute of Medicine. (*Id.*) Plaintiff states that fruit juice is not "real fruit." (Pl.'s Resp. at ¶ 5.) He testified that the

fruit juice from concentrate is served on Mondays, Tuesdays, Thursdays, and Saturdays with breakfast, but he seldom wakes up in time for breakfast. (Pl.'s Dep. at 63:15-64:17.)

At the time relevant to Plaintiff's complaint, Angel Araujo was the food service director at the KCAJC, a position she continues to hold. (*See* Aff. of Angel Araujo, Dkt. No. 34-6, at ¶ 1.) According to Araujo, kitchen workers are responsible for preparing and serving food in accordance with the menu that is prepared by a registered dietician. (*Id.* at ¶ 4.) Regarding serving sizes, kitchen workers are trained and supervised to ensure that each inmate is provided with an appropriate amount of food. (Defs.' Stmt. at ¶ 34.) Kitchen workers also utilize specific serving utensils to ensure that portion sizes are not discretionary. (*Id.*) The jail also performs random spot checks with a scale to ensure that portion sizes are appropriate. (*Id.* at ¶ 35.)

Plaintiff alleges that kitchen workers do not use a steamer to warm food and do not properly wash the food trays and utensils. (Pl.'s Am. Compl. (Dkt. No. 8), at p. 4.; *see* Pl.'s Resp. at ¶¶ 3-4.) According to Araujo, however, kitchen workers use a steam jacket kettle to prepare food and then place it in an electric hot box to keep the food warm until serving time. (Defs.' Stmt. at ¶ 40.) The hot food temperature is kept at a minimum of 140 degrees, which complies with the Illinois Department of Public Health's requirement for holding food temperatures. (*Id.* at ¶ 41.)

It takes approximately 20 minutes to serve all of their inmates their meals. (*Id*. at ¶ 42.) While Defendants' Statement of Facts cites Araujo's affidavit for the proposition that Illinois Department of Public Health guidelines state that hot food does not become potentially unsafe until after four hours of being exposed to temperatures lower than 140 degrees, the cited portion of Araujo's affidavit does not state this assertion. (*Compare*

7

Defs.' Stmt. at ¶ 41 *with* Araujo Aff. at ¶ 6.) Araujo's affidavit does not speak to the issue of how long it takes hot food to become unsafe to eat after it is removed from a heat source. Furthermore, Araujo does state that hot food is not served below 140 degrees (*see* Araujo Aff. at ¶ 7), but it is not clear whether the temperature is measured as the food is being served.[1]

Plaintiff, during his deposition, described the kitchen as "right down the hall" from his cell. (Pl.'s Dep. at 37:20-38:3.) He stated that it takes about 10 minutes to get to his pod from the kitchen, and that the food trays sit in the hallway for 15 to 20 minutes. (*Id.* at 38:4-15.) Plaintiff testified that while he "presume[s]" he became ill due to the food not being hot, he "can't jump to a conclusion." (*Id.* at 66:7-10.)

Plaintiff also described seeing white particles or spots on the food trays and utensils. (*Id.* at 66:24-69:12.) Plaintiff does not know what the particles are, but described them as blended into the trays and stated that he does not know whether the particles come loose because he has not touched them. (Defs.' Stmt. at ¶¶ 46-47; *see* Pl.'s Dep. at 69:2-5.) He does not know if he has ever become sick because of these particles. (Defs.' Stmt. at ¶ 48.) Araujo describes the "white particles" as discoloration from repeated use and cleaning in the KCAJC's dishwashers, rather than loose particles. (*Id.* at ¶ 49.) Kitchen workers at the jail use commercial grade dishwashers to clean inmates' food trays and utensils. (*Id.*

---

[1] The Illinois Department of Public Health advises that potentially hazardous food exposed to the temperature "danger zone" of 41 degrees to 135 degrees for "a cumulative total of more than four hours" during food preparation and serving are not safe to eat. *See* Illinois Department of Public Health, Food Safety Fact Sheet, http://www.idph.state.il.us/about/fdd/fdd_fs_foodservice.htm (last visited January 9, 2017). The parties' filings do not address the issue of how long food at the jail is exposed to the "danger zone" during delivery or food preparation.

at ¶ 50.) In the event that a dishwasher is not functioning properly, the jail workers clean the trays and utensils manually. (*Id.* at ¶ 51.)

## **LEGAL STANDARD**

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material

fact exists only if there is evidence sufficient "to permit a jury to return a verdict for" the non-moving party. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

Correctional officials must provide inmates with a healthy, livable environment, including nutritionally adequate food that is served under conditions that do not present an immediate risk of harm to their health. *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985); *see Smego v. Aramark Food Servs. Corp.*, No. 10-3334, 2013 WL 1987262, at *5 (C.D. Ill. May 13, 2013) (observing that food served to pretrial detainees cannot be so bad as to amount to punishment). While an inmate is not entitled to the diet of his choice, an extended period in which an inmate receives inadequate nutrition amounts to a constitutional violation. *See Widmer v. Hodge*, 13-cv-0025, 2015 WL 1884329, at *4 (S.D. Ill. April 24, 2015) (Williams, M.J.). Similarly, food that is prepared in a manner that "does not meet the minimal standards of safety," or is "routinely unsanitary," so as to present a threat to inmates' health, can rise to the level of a constitutional violation. *See Drake v. Velasco*, 207 F. Supp. 2d 809, 812 (N.D. Ill. 2002). The relevant inquiry is whether the defendants were deliberately indifferent to a substantial risk of serious harm to the inmate's health. *Reed v. McBride*, 178 F.3d 849, 853-54 (7th Cir. 1999).[2]

## **ANALYSIS**

As an initial matter, even viewing the evidence in the light most favorable to Plaintiff, he has failed to submit any evidence that his illness on December 27, 2015, was

---

[2] Although the Fourteenth Amendment provides pretrial detainees with greater protection than convicted prisoners at least with respect to excessive force claims, *see Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), the Seventh Circuit has continued to apply the same standard to deliberate indifference claims brought by pretrial detainees as to those brought by convicted prisoners protected by the Eighth Amendment. *See Phillips v. Sheriff of Cook County*, 828 F.3d 541, 554 n.31 (7th Cir. 2016).

the result of food poisoning, rather than the result of a flare-up of gastritis or some other cause. Plaintiff did not seek treatment for this illness and he presents no medical or other evidence supporting his claim that he suffered foot poisoning. By his own testimony, Plaintiff at best "presume[s]" that he has become ill as a result of his food not being hot. (*See* Pl.'s Dep. at 66:7-10). Speculation and conjecture is insufficient to defeat a motion for summary judgment. *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014).

Further, even if the Court were to accept as true Plaintiff's unsupported allegations that he and his cellmate, Ramirez, suffered food poisoning on December 27, 2015, as a result of the savory stroganoff meal, these assertions do not rise to the level of a constitutional violation. Indeed, a single, isolated incident of food poisoning, even if suffered by many prisoners at an institution, does not rise to the level of a constitutional violation. *See Franklin v. True*, 76 F.3d 381 (7th Cir. 1996) (unpublished opinion) (concluding that one instance of food poisoning is insufficient to state conditions-of-confinement claim); *see also George v. King*, 837 F.2d 705, 707 (5th Cir. 1988) ("a single incident of unintended food poisoning, whether suffered by one or many prisoners at an institution, does not constitute a violation of the constitutional rights of the affected prisoners"); *Jackson v. Lang*, No. 09 C 5123, 2010 WL 3210762, at *1 (N.D. Ill. Aug. 10, 2010) (one incident of finding rodent parts in a meal did not rise to the level of a constitutional violation).

In his response to the pending motion for summary judgment, Plaintiff continues to allege that he has lost weight and been ill as a result of the food in the jail. (*See* Pl.'s Resp. at ¶ 6.) Plaintiff, however, has failed to bring forth any evidence supporting these

contentions, and his deposition testimony contradicts the allegations in his complaint in some respects. Plaintiff cannot backtrack from his deposition testimony in order to create an issue of fact for trial. *See Castro v. DeVry Univ.*, 786 F.3d 559, 571 (7th Cir. 2015) (a party may not contradict his prior sworn testimony in order to create an issue of fact).

Further, at his deposition, Plaintiff testified that other than a bout of the flu and suffering gastritis on-and-off, he has not been ill at the jail. (*See* Pl.'s Dep. at 31:3-12; 42:24-43:5.) This sworn testimony stands in stark contrast to the allegation in his amended complaint that he had been "sickened many times." (*See* Pl.'s Am. Compl., pg. 5.) Regarding his weight, Plaintiff testified that he does not know how much he weighed when he was admitted to the KCAJC in 2014, but estimated that he weighed 150 pounds. (*Id.* at 32:11-21.) Although he does not know his current weight either, he stated that he weighed less now than when he was admitted to the jail in 2014. (*Id.* at 32:22-33:5.) Even viewing these assertions in the light most favorable to Plaintiff, the record is devoid of evidence supporting that Plaintiff has lost a significant amount of weight since his detention at the KCAJC or that any such weight loss is due to an inadequate diet at the jail.

While Plaintiff alleges that he was "shortchanged" food at times, he never attempted to use a cup or other utensil to weigh or otherwise compare portions between trays. (*Id.* at 58:11-20.) Plaintiff has not submitted any evidence indicating that he was deprived a significant amount of calories because of the alleged variation between trays, and by his own account, there were instances in which he received a tray with more food, rather than less. (*Id.* at 59:3-6.)

Even assuming that there is some variation in the amount of food on each tray, Plaintiff has not identified any evidence that this amounts to a significant deprivation or

that jail officials were deliberately indifferent to it. Araujo, the food service director, averred that kitchen workers use specific utensils to keep portion sizes and uniform, and that spot checks are performed. (Araujo Aff. at ¶¶ 8-9.) Plaintiff has not disputed this fact with any evidence, and more importantly, he conceded that his complaint *was not* that he does not get enough food as a general proposition, but rather that the variation in the amount of food on trays was "unfair." (Pl.'s Dep. at 62:23-63-9.)

Finally, while Plaintiff contends that the jail diet is not healthy due to absence of "real fruit" (Pl.'s Resp. at ¶ 5), the undisputed evidence is that the menu plan provides for either fruit or juice containing vitamin C, and that this plan meets nutritional requirements. The uncontested evidence from Lang provides that a certified dietician planned the meals at the jail to ensure that they were nutritionally balanced and met caloric and other nutritional requirements. Therefore, any claim that the jail diet is nutritionally inadequate as a general matter fails. *See Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (claim regarding poorly prepared food failed where affidavit of jail food services director stated that prisoners received three meals a day in compliance with guidelines established by a dietician); *Boyd v. Wright*, No. 09-CV-1357, 2011 WL 777713, at *1 (C.D. Ill. Feb. 28, 2011) (McDade, J.) (observing that the plaintiff offered no evidence that the lack of items including fresh fruit rendered prison menu nutritionally inadequate, and observing, "[t]he menu may not be as palatable or varied as it could be, but that is not the standard.")

Similarly, while Plaintiff alleges that kitchen workers use improper food handling techniques, he provides no evidence to support his claim. By his own admission, he has not been to the kitchen and does not know whether kitchen workers use food warmers. (Pl.'s Dep. at 66:19-23.) His contention seems to be that that the failure to keep the food

13

on a steamer during the serving process is an unsafe practice. (*See* Pl.'s Resp. at ¶ 4.) While Plaintiff contends that there is a risk of food poisoning because the temperature of the food drops below 140 when it is brought to the jail decks, this assertion is again based on nothing more than speculation. Although Araujo's affidavit does not provide a complete accounting of the jail's food handling practices, the record evidence supports that it takes 20 minutes to a half hour for meals to be served.[3] Plaintiff has not provided any evidence indicating that the practice of heating hot food to the recommended temperature of 140 degrees, then dividing it into individual trays for serving over a half-hour period, poses a substantial risk of harm. Plaintiff further has not provided any evidence that Sheriff Kramer and Director Lewis were aware of this alleged risk of harm but failed to take action. Mere allegations, which are all that Plaintiff has brought forward, are not evidence and do not establish a question of fact. *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012).

Regarding the "white particles" on the trays, Plaintiff again has failed to identify any evidence that the "particles" made him ill or that they were anything other than discolorations from repeated use and cleaning, as Araujo states. While Plaintiff appears to contend in his response that Defendants have failed to prove that the food trays are properly sanitized (*see* Pl.'s Resp. at ¶ 3), the only evidence in the record is that kitchen workers use commercial grade dishwashers that adequately clean the trays and utensils. In sum, there is no evidence in the record supporting Plaintiff's claims that he receives a nutritionally

---

[3] Plaintiff's deposition describes the process of serving food as taking as long as 30 minutes – 10 minutes to get from the kitchen to the pod, and then 20 minutes for inmates to receive their trays (*see* Pl.'s Dep. at 38:6-13), in comparison to the 20 minutes estimated by Araujo.

inadequate diet or that kitchen employees employ improper food handling or cleaning techniques that put his health at risk.

## **CONCLUSION**

For the reasons stated herein, Defendants' motion for summary judgment (Dkt. No. 32) is granted. Final judgment will be entered. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Dated: January 10, 2017

                                              AMY J. ST. EVE
                                              United States District Court Judge